THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

WILLIAM C. DISS,

      Plaintiff,

      v.

PORTLAND PUBLIC SCHOOLS,
et al.,

      Defendants.

No. 3:14-cv-01649-PK

**OPINION AND ORDER**

**PAPAK, Magistrate Judge:**

      Plaintiff William C. Diss brings this employment discrimination action against defendants Portland Public Schools (the School District); Carol Campbell, the principal at Benson Polytechnic High School (Benson) from 2011 to 2013; Jeandre' Carbone, a vice principal at Benson; and Frank Scotto, the School District's regional director for human resources.[1] Plaintiff, who was a teacher at Benson, asserts that Defendants disciplined and ultimately terminated him because of his religious beliefs, in particular because of his opposition to Planned Parenthood. Plaintiff brings claims under the First Amendment and the Equal Protection Clause, and under federal and state statutes prohibiting discrimination based on religion.

---

1. Plaintiff voluntarily dismissed the other defendants named in his complaint. Plaintiff has abandoned his claims for due process violations, hostile environment, whistle-blowing, and wrongful discharge.

Defendants now move for summary judgment on all of Plaintiff's claims. After reviewing the briefs and supporting exhibits, I grant Defendants' Motion for Summary Judgment.

The key issue underlying all of Plaintiff's claims is Defendants' motivation for terminating Plaintiff. Plaintiff contends that Defendants "unfairly target[ed]" him "because of his religious beliefs." Pl. Opp'n. 2, ECF No. 41. I conclude, however, that Defendants have shown that they had valid, non-discriminatory reasons to discipline and terminate Plaintiff. The record contains multiple reports from administrators and colleagues describing Plaintiff's ineffective and rigid teaching style, as well as a pattern of complaints about Plaintiff's disrespectful and demeaning conduct towards his students, colleagues, and administrators. In response, Plaintiff has not presented evidence from which a reasonable jury could find that Defendants retaliated against Plaintiff because of his religion.

## BACKGROUND

Plaintiff is a devout Catholic who follows "all of the church's teachings about sexual health and morality, and observe[s] the church's teachings on defending and promoting the dignity of life from the moment of conception until natural death." Diss Decl. ¶ 2, ECF No. 42. Plaintiff joined "a coalition of religious and community organizations to educate the public about the evils of abortion and Planned Parenthood." Diss Decl. ¶ 4. Plaintiff has organized protests against Planned Parenthood and abortion, and he is a leader of Precious Children of Portland, which "promotes the sanctity of human life and opposes abortion." Diss Decl. ¶ 13.

Plaintiff began teaching at Benson in August 2002. He initially taught computer science and technology, electronics, and drafting.

Starting in the 2006-07 school year and continuing throughout his tenure at Benson, Plaintiff was repeatedly disciplined by administrators for making derogatory comments to students. Plaintiff now asserts that he "never attempted to demean or insult students -- only to

motivate their behavior and improve their conduct." Pl. Trial Br. 6, ECF No. 53. Plaintiff's

own testimony, however, indicates a different approach. Plaintiff was asked at his deposition,

"if a student feels demeaned by the teacher, . . . that's not a good thing, is it?" Plaintiff

responded, "No. I think it's great. I felt demeaned quite a few times in school of how a

teacher treated me, but then I knew that I had to kind of get my act together." Depo. Trans., at

3, ECF No. 51-1. Plaintiff explained, "I think every teacher has to use terms that might seem

harsh, demeaning, you know, pick your favorite adjective, to make sure there's good order in .

. . a classroom and to let people know the consequences of their behavior." Depo. Trans., at 3.

The record indicates that Plaintiff adhered to this philosophy during his teaching career at

Benson.

     In September 2006, Benson principal Christie Plinski, who had hired Plaintiff,

reprimanded Plaintiff for his "instructional style and denigrating language toward students."

Norwood Decl., Ex. 1, at 154-55, ECF 36-2. Plinski noted that "this was not the first

conversation -- and indeed warning -- about this type of behavior in your classroom." Plinski

stated, "In responding to my questions, you conceded that you had wanted to make an

impression on the students and to warn them to be 'on their best behaviors' for a substitute

teacher. You stated that you often used terms like 'bum, slacker, loser' with the students to

'get them to realize the future is looking down on them' and that 'In a few years, rubber meets

the road and its [sic] important to start working on things.' You further stated that you often

used these terms 'in jest.'" Plinski explained that "at no time is it appropriate to use

pejorative terms with students along the lines of 'bum, slacker, loser,' and that words such as

these do not motivate students, but rather denigrate and demean them." Plinski stated that she

had warned Plaintiff about his use of denigrating words the previous summer. Plinski

concluded that Plaintiff's denigrating behavior towards students must stop immediately.

     In April 2007, Plaintiff "organize[d] a protest against Planned Parenthood building a

new facility in Northeast Portland." Diss Decl. ¶ 4. During that time, Plinski reprimanded

Plaintiff for using a school telephone during working hours to call a neighborhood coalition to complain about a proposed Planned Parenthood facility. Plinski told Plaintiff to use his own time and resources when promoting personal and political beliefs, and warned Plaintiff not to represent himself as a public school employee when promoting those beliefs. Ex. 162, ECF No. 43-14.

In November 2007, vice principal Susan Schenk wrote Plaintiff a letter of reprimand, ordered him to "stop using demeaning terms such as looser [sic], slacker, ugly and stupid. You will stop engaging in put downs in which you make fun of students and they are allowed to make fun of you in response." Norwood Decl., Ex. 1, at 156. Schenk noted that Plaintiff's teaching style made students "perceive that you dislike them because you insult them or their classmates. They feel angry, unsafe and unmotivated."

In December 2007, a local reporter recognized Plaintiff as a teacher at Benson while Plaintiff was leading an anti-abortion rally. Schenk warned Plaintiff not to associate Benson or the School District with his political or religious activities. Schenk reminded Plaintiff that he had agreed not to identify himself as a School District employee during his anti-abortion activities. Schenk attached a copy of the School District's rules and guidelines governing political conduct by its employees.

In 2009, vice principal Barry Phillips twice issued letters of warning to Plaintiff. In an April 2009 letter, Phillips stated that Plaintiff told a student "that you're going to end up in front of a judge and go to prison, be a bum, and that he better start filling out his cardboard box sign." Norwood Decl., Ex. 1, at 157. Phillips ordered Plaintiff not to "communicate to any student in a derogatory or disrespectful manner."

Phillips later testified that when Plaintiff started teaching math at Benson, "complaints started coming in . . . frantically. Like every day almost. Several per week [from different students]." Norwood Decl., Ex. 1, at 122.

In another April 2009 letter to Plaintiff, Phillips stated that Plaintiff had failed to

respond to several complaints from parents of students in Plaintiff's classes. Norwood Decl., Ex. 1, at 158. Plaintiff then failed to appear at a scheduled meeting with a parent, resulting in the meeting starting almost 20 minutes late. Phillips stated that Plaintiff's ignoring or minimizing the meeting "reflects poorly on you, Benson H.S., and [is] extremely discourteous to the student's family and very unprofessional."

In May 2009, Phillips issued a second warning to Plaintiff, ordering him to "cease and desist" "telling students they should join the 'do nothing club' and battle out who should be president, announcing how many assignments any student has turned in [in] front of the entire class." Norwood Decl., Ex. 1, at 159. Phillips concluded, "The expectation for the future is that you will not communicate to any student in a manner considered degrading, humiliating, harmful, unprofessional, derogatory or in a disrespectful manner."

Also in May 2009, then-principal Steve Olczak evaluated Plaintiff based on his personal observation of Plaintiff's teaching methods. Olczak noted Plaintiff's "continuous use of sarcasm, and supposed humorous remarks to students that are negative by nature and tend to draw like responses from students." Norwood Decl., Ex. 1, at 196. Although Plaintiff told Olczak that his comments were meant to challenge students, Olczak observed "many students are offended and do not respond well to these confrontational, and derogatory remarks." Norwood Decl., Ex. 1, at 196. Olczak noted, "Calling students stupid, or bums, does not earn student respect. Likewise, interjecting specific opinions about individual [students'] behavior that is confidential information, and e-mailing the entire staff, [most of whom] do not even know the student is both disrespectful and professionally unacceptable." Norwood Decl., Ex. 1, at 196.

Plaintiff added a handwritten note to the evaluation, stating that it was "very unfair," and added, "I will be praying for all of those at this district and the school who seem to enjoy harassing Mr. Diss." Norwood Decl., Ex. 1, at 199, Plaintiff now states that he "believe[s] the evaluation was largely based on the publicity that surrounded my political activities at the

time." Diss Decl. ¶ 9. Other than Plaintiff's own speculation, however, there is no evidence that Olczak's negative evaluation in 2009 was linked in any way to Plaintiff's religion or his political activities.

Plaintiff filed a grievance challenging the 2009 evaluation. Based on an unrelated settlement agreement between the School District and the union, the evaluation was later removed from Plaintiff's personnel file, along with about ten other employee evaluations. Fargey Decl., Ex. 7, ECF No. 43-7.

Defendant Carol Campbell began working as the principal at Benson in the 2011-12 school year. Campbell is Catholic and had worked 14 years as a teacher and administrator at a private Catholic high school before taking a teaching job at Grant High School in Portland. *See* Defs. Witness Statements 3, ECF No. 49. Defendant Jeandre' Carbone started as vice principal at Benson at the same time.

Campbell first met Plaintiff in the summer of 2011, when he visited her in her office. At that time, Plaintiff was not assigned to a particular school.

In October 2011, the School District notified Campbell that Plaintiff would be assigned to teach math full-time at Benson. Phillips had previously told Campbell that based on his experience with Plaintiff, Campbell should not accept Plaintiff as a math teacher, noting that Plaintiff was the subject of multiple student complaints and requests to transfer out of his class. Norwood Decl., Ex. 1, at 122, ECF No. 36-1. There is no evidence in the record that Campbell was aware at this time of Plaintiff's religion or his opposition to Planned Parenthood. Campbell emailed the School District on October 11, 2011, asking to replace Plaintiff with another math teacher. Campbell stated that Plaintiff "is not a good fit for this position and has proven himself incapable of being an effective teacher." Norwood Decl., Ex. 1, at 201.

Plaintiff sent Campbell an email using the phrase "God bless." Campbell told Plaintiff to refrain from using such religious phrases in professional emails to parents or School

District employees.  Campbell was told by her predecessor that a parent had complained about Plaintiff's use of religious phrases in an email.  Another parent complained during Campbell's tenure about Plaintiff's use of religious phrases in his communications.

During the 2011-12 school year, Campbell observed Plaintiff's computer science class. She worked with Plaintiff to improve his teaching skills.  She noted that Plaintiff was disorganized and did not plan lessons or prepare to use class time effectively.  Campbell also noted that an unusually high number of students had dropped or transferred out of Plaintiff's computer science class.  Norwood Decl., Ex. 1, at 11.  Although Campbell worked with Plaintiff throughout the school year, she saw no improvement.

For the 2012-13 school year, Campbell decided to assign Plaintiff to teach a computer science class and a tutorial class with computers available, in an attempt to use Plaintiff's strengths and avoid assigning him to math classes.  Norwood Decl., Ex. 1, at 12.

In September 2012, Campbell arranged for presentations to encourage students, with parental permission, to join the Teen Outreach Program (TOP), a voluntary federal program intended to reduce academic failures and teen pregnancies.  TOP was presented to students by facilitators, who were trained to ensure that the program is essentially the same nationally.

For the 2012-13 school year, defendant Campbell chose to move TOP from the health class to tutorial class, to avoid cutting into instructional time.  She also determined that TOP would not include any sex education, because that was already covered in health class. Students who chose to participate in TOP would be dismissed from tutorial classes to attend TOP meetings in another classroom.

On September 11, 2012, Carbone emailed Plaintiff and the other tutorial teachers explaining that TOP facilitators would be visiting tutorial classrooms on September 17 and 18, 2012, to talk to students.  Carbone's email did not mention that the TOP presenters would be employees of Planned Parenthood, and there is no evidence that Carbone or Campbell knew Planned Parenthood employees would be involved until the day the TOP presenters

arrived at Benson.

On September 17, 2012, as scheduled, TOP facilitator Austin Lea entered Plaintiff's tutorial classroom with TOP brochures and posters. Plaintiff read a letter from TOP directed to parents, describing TOP as an evidence-based, youth development program administered by the Northwest Coalition for Adolescent Health and its member Planned Parenthood Columbia Willamette. The letter stated that TOP focused on "supporting healthy behaviors," developing life skills," and "finding a sense of purpose." The letter did not mention sexuality or abortion.

Plaintiff became very upset by the presence of Planned Parenthood employees. Plaintiff interrupted Lea and asked him to step outside the classroom, where he told Lea to get out of his classroom because Lea worked for Planned Parenthood. Plaintiff claimed that Planned Parenthood was racist and practiced eugenics. Another TOP presenter then went to Campbell's office and asked for her assistance in dealing with Plaintiff.

Campbell went to the class and asked Plaintiff why he had interrupted the program. Plaintiff said that TOP was against his religious beliefs, and that he opposed it. Plaintiff refused to discuss the issue further without a union representative. Campbell stated that she did not know Plaintiff's religious beliefs. Plaintiff told Campbell that he was sick to his stomach and went home.

That night, Campbell emailed Plaintiff, stating that she respected his religious beliefs, but TOP was approved by the School District and was not religious. Campbell told Plaintiff that he needed to allow the TOP presentation at his tutorial class the next day.

The next day, September 18, 2012, TOP presenters came to Plaintiff's tutorial class. Plaintiff again did not cooperate with the presentations. One of the presenters sought Campbell's help. Campbell observed Plaintiff harassing the presenters by repeatedly asking them who they worked for and following them around the room.

On September 19, 2012, Campbell, Carbone, and Scotto met with Plaintiff, who was

represented by an attorney who appeared by phone. Defendants discussed Plaintiff's refusal to allow the TOP presenters into his tutorial class. Plaintiff asserted that TOP concerned family planning, contraception, and abortion. Defendants responded that Plaintiff did not understand TOP, which was not religious. Defendants ordered Plaintiff to allow TOP presentations in his classroom. Plaintiff's attorney advised him to obey that directive.

Later that day, at another TOP presentation, Plaintiff spent more than 20 minutes taking attendance, although there were only 10-15 students. Carbone arrived to see whether Plaintiff was complying with Defendants' orders to allow TOP presentations. According to Carbone, when she started to introduce the TOP presenters, Plaintiff interrupted, asking loudly whether he could finish taking attendance. Carbone said that she thought he was finished, and Plaintiff became louder and said, "What, are you saying I'm slow?" Norwood Decl., Ex. 1, at 44. When the TOP presentation was done, Plaintiff asked Carbone in front of the students whether she thought he had been rude. Carbone asked Plaintiff to discuss the matter at another time, and Plaintiff responded, "I think I have a right to know if you think I was rude or not." Norwood Decl., Ex. 1, at 47. Plaintiff moved very close to Carbone and raised his voice. Carbone was concerned that Plaintiff had repeatedly yelled at her in front of students.

On September 20, 2012, Carbone returned to Plaintiff's tutorial class to confirm that he would allow the TOP presentation to proceed. Plaintiff again used 20 minutes to take attendance. When the TOP presenters began to speak, Plaintiff interrupted and asked Carbone whether he could talk to the class. Plaintiff told the students he was sorry to disappoint them but that the multiplication table lesson would be postponed because the TOP guests had priority. Norwood Decl., Ex. 1, at 147. Carbone asked Plaintiff to talk to her later in private about the multiplication tables, reminding Plaintiff that the tutorial class was to be for independent study, not math class. Plaintiff repeatedly interrupted Carbone, stating, "Put it in writing" several times. Norwood Decl., Ex. 1, at 148. Carbone left the class in frustration.

On September 26, 2012, Campbell issued a written reprimand to Plaintiff for his

obstruction of the TOP presentations. Norwood Decl., Ex. 1, at 145. Campbell directed Plaintiff to comply with administrative directives; to notify the administration if he had difficulty complying with a directive; and to stop verbally attacking TOP presenters by calling them "racist" or other insults.

After receiving "a number" of emails from Plaintiff using the phrase "God bless you," on September 26, 2012, Carbone told Plaintiff not to use religious phrases in his professional communications with staff or students. Norwood Decl., Ex. 1, at 50, 144. Carbone stated that she had learned that public school teachers "are required to remain religious neutral" in official communications. Norwood Decl., Ex. 1, at 50.

On October 8, 2012, Campbell issued a letter of reprimand to Plaintiff for his harassment and other unprofessional behavior towards Carbone. Campbell wrote that when she met with Plaintiff earlier that day, Plaintiff indicated he "did not view [his] actions as disrespectful and/or unprofessional," but he assumed Campbell and Carbone thought he was disrespectful or rude. Norwood Decl., Ex. 1, at 148.

Campbell stated that Carbone felt "intimidated, bullied and harassed" during her interactions with Plaintiff. Campbell noted that Plaintiff had refused to talk with Carbone in private, away from students, and interrupted her several times. Campbell stated that Plaintiff's conduct undermined Carbone's ability to keep the respect of students, and that his conduct violated the School District's anti-harassment policy. Campbell issued directives to Plaintiff, requiring that he behave professionally at all times; communicate with colleagues and administrators in a respectful, professional tone; and not attempt to harass or intimidate administrators or colleagues.

That evening, Carbone attended a Benson football game as an administrator. During the game, Plaintiff confronted Carbone in the stands, yelling at her, "Hey, I'm really sorry if you thought I was rude to you a few weeks ago, but I thought you were really rude too."

Plaintiff now alleges that he "attempted to apologize to Ms. Carbone over the loud

football game -- I never intended to shout or be rude -- I was being genuine. . . . I had to speak loudly to her because of the football-volumed cheers of the students." Diss Decl. ¶ 22. Carbone, and several witnesses, had a different impression of Plaintiff's conduct. Carbone thought that Plaintiff's apology was sarcastic, and she was shocked that he would confront her this way in front of parents and students. Carbone considered Plaintiff's behavior aggressive and disrespectful to her. At least two parents who witnessed the event thought Plaintiff was unprofessional. One parent stated in an email to the school that she "was appalled that this had even happened, that another staff member would act this way in front of a crowd in such an arrogant and rude manner." Norwood Decl., Ex. 1, at 202, ECF No. 36-2.

On October 15, 2012, Plaintiff, his union representative, and an attorney met with Campbell, Carbone, and Scotto about Plaintiff's conduct at the football game. Plaintiff characterized his conversation with Carbone to be "somewhat private" because of the noise at the football game. Norwood Decl., Ex. 1, at 150.

In a subsequent warning letter to Plaintiff dated October 18, 2012, Campbell stated that she believed Plaintiff was "intentionally harassing" Carbone. Norwood Decl., Ex. 1, at 150. Campbell noted that Plaintiff had been reprimanded on the day of the football game for similar conduct, raising his voice and undermining Carbone's authority in front of students. Campbell stated that Plaintiff's conduct at the football game had also undermined Carbone's authority, noting that students "sitting in the area were laughing." Norwood Decl., Ex. 1, at 150. Campbell stated that Plaintiff's "tone and body language was intimidating and rude. Considering the meetings, directives and reprimands that have occurred in the past few weeks, I would expect you to make every effort to ensure you conduct yourself in a professional manner. Instead, you seem to be intentionally seeking opportunities to be unprofessional and disrespectful." After recounting the recent letters of reprimand against Plaintiff, Campbell stated that this was Plaintiff's final warning. She suspended Plaintiff for one day without pay, October 22, 2012.

Carbone evaluated Plaintiff's teaching during the 2012-13 school year. She observed Plaintiff teaching Introduction to Computers in October 2012, and Advanced Algebra and Geometry in November 2012. Carbone states that she received "a high volume" of written and oral complaints about Plaintiff's "rigid instructional style; the complaints were frequently accompanied by requests to transfer out of his classes." Carbone Decl. ¶ 6, ECF No. 35. Concerned about the number of complaints, Carbone again observed Plaintiff's teaching, and noted that he had not implemented most of the recommendations from her previous evaluations. Plaintiff was "among the least compliant of all teachers at Benson" in submitting lesson and unit plans. Carbone Decl. ¶ 10.

In her evaluation of an algebra class on November 15, 2012, Carbone noted Plaintiff required students to memorize multiplication tables, and gave a quiz at the beginning of each class, even though multiplication tables are not part of the Oregon requirements for algebra. Carbone Decl., Ex. 2, at 5. Carbone again gave Plaintiff specific recommendations to improve his teaching.

Between November 13, 2012, the first day of Plaintiff's math class, and January 8, 2013, Carbone received written complaints from 16 students and their parents. Many of the complaints requested transfers from his class, and criticized Plaintiff's requirement that students memorize multiplication tables in an advanced algebra class.

Plaintiff contended that Campbell and Carbone believed students' complaints rather than accepting Plaintiff's version of the events. In response, Carbone asked Joshua Curtis, who taught in a classroom next to Plaintiff, to report on Plaintiff's teaching style.

Curtis stated that Plaintiff "yelled at students to get the classes attention, during confrontations with students and when he appears to have lost control of his behavior. [Plaintiff] does not appear to have any other means of getting students attention, or managing the class. He will yell at a whole class several times a week before taking attendance." Norwood Decl., Ex. 1, at 167.

Curtis noted that Plaintiff "will also get into confrontations with students" for "minor misbehavior" such as talking quietly to a neighboring student or drinking water from a fountain in the classroom. Plaintiff did not tell students his expectations at the beginning of the class, so students were unaware that they were misbehaving until Plaintiff yelled at them. Curtis cited specific examples, such as Plaintiff yelling at a student for not retrieving a pencil fast enough, or calling another student "disgusting" because the student was unprepared for class. Curtis concluded that Plaintiff's behavior caused many students to drop Plaintiff's courses.

In an evaluation dated February 4, 2013, Carbone summarized her observations of Plaintiff's teaching. She noted his "instructional rigidity," with every student required to do the same problem, the same way, regardless of background or experience. On the first day of advanced algebra class, Plaintiff required that students write, "Mr. Diss is the boss and all problems need to be worked how Mr. Diss says." Carbone noted that Plaintiff was inconsistent in managing student behavior, either "strict and oppressive, not allowing students to speak at all, or he is inattentive and seems unaware that students have finished their work and are off task." Carbone Decl., Ex. 8, at 3.

At a meeting with School District administrators on February 12, 2013, Plaintiff was notified about the evidence of his poor classroom conduct, as reported by students and Curtis. Plaintiff admitted some but not all of the conduct.

On February 28, 2013, Campbell issued a second final warning, directing Plaintiff to stop behaving unprofessionally towards students.

On March 1, 2013, a student named Ivan told Amy Slaughter, a teacher, that Plaintiff given a geometry test question that named Ivan as a person trapped in a burning building. The student was in tears and seemed upset by the question. Slaughter found Plaintiff's decision use the student's name in the math problem to be "completely" inappropriate. Norwood Decl., Ex. 1, at 131.

Plaintiff states that the question was intended to get the student, who was very passive, involved in the class. Plaintiff states that the student "liked it," showing excitement about being named in the question, and that it was the only question the student answered. Diss Decl. ¶ 29.

On March 19, 2013, Plaintiff was placed on paid administrative leave. Norwood Decl., Ex. 1, at 204, ECF No. 36-2. On December 16, 2013, the Board of Education approved the dismissal of Plaintiff, effective the next day. Norwood Decl., Ex. 1, at 191.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party's burden "is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). A dispute as to a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255. A "mere disagreement or the bald assertion that a genuine issue of material fact exists" is not sufficient to preclude the grant of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

## DISCUSSION

### I. First Amendment Claims

Plaintiff brings three claims under the First Amendment, asserting that Defendants retaliated against him in violation of his rights to free speech, to free association, and to the free exercise of religion. To establish a retaliation claim for asserting rights under the First Amendment, Plaintiff must show that (1) he was subjected to an adverse employment action; (2) he engaged in protected speech; and (3) the protected speech was a "substantial motivating factor" for the adverse employment action. *See Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002).

Because Plaintiff was a public employee, his First Amendment retaliation claims are evaluated under the test described in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). On the other hand, the First Amendment "does not empower [public employees] to 'constitutionalize the employee grievance.'" *Id.* at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

This court uses a five-part balancing test to evaluate First Amendment claims asserted by public employees. *See Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.2009) ("unravel[ing]" and clarifying the *Pickering* test). The balancing test provides:

> First, the plaintiff bears the burden of proof at trial of showing (1) that she spoke on a matter of public concern; (2) that she spoke as a private citizen rather than a public employee; and (3) that the relevant speech was "a substantial or motivating factor in the adverse employment action." [*Eng*, at 1070–71.] If the plaintiff establishes such a prima facie case, the burden of proof shifts to the government to show that (4) "the state had an adequate justification for treating the employee differently from other members of the general public"; or (5) "the state would have taken the adverse employment action even absent the protected speech." *Id.* at 1070–72.

*Coomes v. Edmonds School Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (footnote omitted). "[B]ecause these are sequential steps, a plaintiff's failure to satisfy a single one

necessarily concludes [the Court's] inquiry." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961-62 (9th Cir. 2011) (internal quotation marks and citations omitted).

### A. First Amendment Claim Based on Free Speech

In Plaintiff's first claim for relief, he asserts that Defendants retaliated against him for exercising his rights to free speech under the First Amendment. Defendants are entitled to summary judgment on this claim because the First Amendment "does not protect speech by public employees that is made pursuant to their employment responsibilities -- no matter how much a matter of public concern it might be." *Coomes*, 816 F.3d at 1260. When public employees speak pursuant to their official duties, they are not speaking as private citizens "'and the Constitution does not insulate their communications from employer discipline.'" *Id.* (quoting *Garcetti,* 547 U.S. at 421). Here, it is undisputed that the speech Plaintiff asserts is protected "owes its existence" to Plaintiff's position as a teacher, so Plaintiff necessarily "spoke as a public employee, not as a citizen." *Id.* (citations and quotation marks omitted). For example, Plaintiff's objections to the TOP presenters stemmed from his position as a teacher. Similarly, Plaintiff's statements to Carbone in his tutorial class stem from his role as a teacher. Plaintiff's loud apology to Carbone at the football game was not on a matter of public concern, but rather addressed a personal dispute. In any event, a teacher necessarily acts as a teacher "for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." *Johnson*, 658 F.3d at 967.

Even assuming Plaintiff could show that he spoke as a private citizen, he has not produced evidence that Defendants disciplined him because of his protected speech. "Speculation as to [a defendant's] improper motive does not rise to the level of evidence sufficient to survive summary judgment." *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003). It is undisputed that Plaintiff was the subject of multiple complaints based both on his unprofessional conduct and his flawed teaching style. I agree with the Third

Circuit that "it is generally appropriate to consider the reactions of students and parents to an educator's speech under the *Pickering* balancing test." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 475–76 (3rd Cir. 2015) (noting agreement with decisions from the Second and Seventh Circuits). Although Plaintiff disputes the validity of some, but not all, of the complaints against him, the accuracy of the complaints is not relevant to determining Defendants' motivation for disciplining Plaintiff. Plaintiff has not shown any evidence indicating that his termination was based on his religion or opposition to Planned Parenthood.

Even if Plaintiff had evidence of a discriminatory motive, Defendants have presented evidence showing that Plaintiff would have been terminated anyway, given his repeated defiance of directives to act professionally towards colleagues, administrators, and students.

### B.  First Amendment Claim Based on Free Association

Plaintiff claims that Defendants retaliated against him because of his association with a group that opposed Planned Parenthood.  Plaintiff has failed to show that Defendants retaliated against him because of his association.  Instead, as discussed in the background section, Defendants had ample reasons to terminate Plaintiff based on his continued unprofessional and harassing behavior, which he refused to modify despite repeated opportunities to do so.

### C.  First Amendment Claim Based on Free Exercise of Religion

Plaintiff claims that Defendants violated his First Amendment rights to freely exercise his religion by (1) requiring him to supervise his tutorial class during the TOP presentations; (2) asking him to refrain from using religious phrases such as "God bless" in professional communications; and (3) creating an environment that chilled his ability to exercise his religious beliefs.  Defendants are entitled to summary judgment on this claim.

The speech in question generally concerns Plaintiff's official duties as a teacher, precluding protection under the *Pickering* test.  This covers Plaintiff's objections to the TOP presenters in the tutorial class.  As the Ninth Circuit has held, "school teachers have no First

Amendment right to influence curriculum as they so choose." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1015-16 (9th Cir. 2000); *Johnson*, 658 F.3d at 962-63 (classroom instruction is part of teacher's official duties and is therefore unprotected employee speech).

Defendants acted properly in directing Plaintiff to avoid religious phrases in his professional, school-related communications. Public schools "have a constitutional duty to ensure that public school teachers do not give the impression that the school prefers one religion or even religion in general." *Williams v. Vidmar*, 367 F. Supp. 2d 1265, 1273 (N.D. Cal. 2005); *see also Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517, 522 (9th Cir. 1994) (high school students likely to equate views of a teacher with those of the school).

As to Plaintiff's claim that Defendants created an environment that chilled his ability to exercise his religion, Plaintiff has not shown that Defendants acted improperly. I agree with Defendants that Plaintiff has not shown that requiring him to allow employees of Planned Parenthood into his tutorial class to promote a federally funded program burdened his religious activities, or permitted him to obstruct the presenters. The presenters were encouraging students to enroll in the program, not operating the program itself in the class.

In *Williams v. California*, 990 F. Supp. 2d 1009, 1024 (C.D. Cal. 2012), *aff'd*, 764 F.3d 1002 (9th Cir. 2014), the court addressed a similar free exercise claim. There, care providers for developmentally disabled clients challenged statutory requirements that they accompany clients to religious services, claiming that being present at Jehovah's Witness services would conflict with their own and their employees' religious beliefs and practices. The district court rejected the First Amendment claim, reasoning that the regulations would not "require Plaintiffs to adopt any particular religious beliefs or to worship, engage in prayer, or otherwise participate in any religious services. Insofar as the regulations require Plaintiffs to merely be present at Jehovah's Witness services, and thus inhibit their own practice of religion because that is something that their religion allegedly prohibits, we cannot say that this is the 'primary effect' of the regulations." *Id.* Similarly, here Defendants required only

18 - OPINION AND ORDER

that Plaintiff be present while the TOP presenters described the program to students.

## II. Qualified Immunity

As an alternative holding, I conclude that the individual defendants are entitled to qualified immunity. Even if Plaintiff could show a violation of his constitutional rights, he has not shown that reasonable officials in the individual defendants' positions would have known that their actions would violate Plaintiff's constitutional rights.

"Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066–67 (9th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In ruling on qualified immunity, the court asks "(1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Here, I conclude that Plaintiff's asserted First Amendment right to engage in the speech at issue was not clearly established. "Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998) ("today we join the chorus of voices from other circuits that have specifically observed the difficulty of finding clearly established law under *Pickering*,"). I conclude that Campbell, Carbone, and Scotto are entitled to qualified immunity as to Plaintiff's First Amendment claims.

## III. Equal Protection Claim

Plaintiff brings a claim under the Equal Protection Clause. To prevail on an equal protection claim, Plaintiff must show that Defendants acted in a discriminatory manner and that the discrimination was intentional. *Reese v. Jefferson Sch. Dist. No 14J*, 208 F.3d 736,

740 (9th Cir. 2000). Discrimination is intentional if the defendant's action were motivated, at least in part, by the plaintiff's protected status. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).

Here, Plaintiff has failed to present evidence that any similarly situated teacher with a comparable record of complaints and conduct violations was not dismissed. Nor has Plaintiff submitted evidence that any defendant was anti-Catholic or otherwise opposed to Plaintiff's religious beliefs. Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

## IV. The School District Is Entitled to Summary Judgment

### A. Civil Rights Claims Under 42 U.S.C. § 1983

The School District may not be held vicariously liable under 42 U.S.C. § 1983 for the actions of its subordinates. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Instead, to show that the School District is liable, Plaintiff must present evidence of "'a direct causal link between a [School District] policy or custom and the alleged constitutional deprivation.'" *Castro*, 833 F.3d at 1075 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Here, Plaintiff has failed to present evidence that the School District had a custom or policy of disciplining or terminating employees in retaliation for the exercise of First Amendment rights. Nor has Plaintiff presented evidence that the School District had a custom or policy of treating Catholic teachers differently than other teachers.

### B. Religious Discrimination Claims Under State and Federal Statutes

Plaintiff brings claims for religious discrimination against the School District under Title VII, 42 U.S.C. § 2000e-2, and under Or. Rev. Stat. § 659A.030. The resolution of the Title VII claim determines the resolution of the state claim. *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1441 n.2 (9th Cir. 1993) ("state statutory claim succeeds or fails with [the plaintiff's] Title VII claim"). To prevail, Plaintiff must show that he suffered an adverse employment action because of his religion. *Id.* at 1437 (citing 42 U.S.C. § 2000e–2(a)(1)).

Here, undisputed evidence shows that Plaintiff was disciplined and ultimately terminated because of his continued unprofessional conduct. Plaintiff has not shown that he was terminated because of his religion. Benson administrators reprimanded Plaintiff for his demeaning teaching style in 2006, before Plaintiff's 2007 protest of a Planned Parenthood facility. Plaintiff has not shown that Carbone or Campbell were aware of his opposition to Planned Parenthood before the TOP presenters arrived at Benson in September 2012.

I also conclude that Plaintiff not shown facts supporting his claim that the School District failed to accommodate his religion. There is no indication that Plaintiff ever requested accommodation, even though he was represented by counsel at several meetings with Defendants. Even if Plaintiff had requested an accommodation, he has not presented evidence that any religious observance or practice conflicted with his official duty as a teacher to allow the TOP presenters in his tutorial class. Plaintiff's personal antipathy towards Planned Parenthood and its employees is not sufficient to show the need for a religious accommodation.

## CONCLUSION

Defendants' Motion for Summary Judgment, ECF No. 34, is GRANTED.

IT IS SO ORDERED.

DATED this 22nd day of November, 2016.

PAUL PAPAK
U.S. MAGISTRATE JUDGE